J-A23023-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF:  D.L.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF:  D.L.W., SR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 317 WDA 2025 |

Appeal from the Order Entered February 27, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000184-2023

BEFORE:  PANELLA, P.J.E., McLAUGHLIN, J., and BENDER, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED: November 10, 2025**

D.L.W., Sr. ("Father") appeals from the order terminating his parental rights as to his minor child, D.L.W. ("Child"). He challenges the sufficiency of the evidence. We affirm.

Child was born in September 2021. Child's mother ("Mother") and Father were married at the time of Child's birth. N.T., 7/5/24, at 51. One day after Child's birth, the Allegheny County Office of Children, Youth and Families ("CYF") obtained an emergency order due to concerns about Mother's mental health and medication management. *Id.* at 46, 47. Father reported that he had concerns with leaving Child in Mother's care due to her mental health but indicated that he was unable to provide round-the-clock care of Child because he worked full time. *Id.* at 48-49. CYF had concerns about Father's abilities to act protectively and make decisions because he was unable to verbalize a plan to ensure Child's safety. *Id.* Child was placed into the care of a foster family

("Foster Parents") when he was six days old. *Id.* at 50; N.T., 2/20/25, at 155. Child was adjudicated dependent approximately five months later, in February 2022. N.T., 7/5/24, at 46-47. Child has been living with Foster Parents since his discharge from the hospital, and it is a pre-adoptive home. N.T., 2/19/25, at 65-66; N.T., 1/10/25, at 239. Since Child came into care, he has never been in the care of Father or Mother. N.T., 1/10/25, at 240.

On July 27, 2023, CYF filed a petition for involuntary termination of parental rights. A hearing on the petition was held over four days, on July 5, 2024, January 10, 2025, February 19, 2025, and February 20, 2025. At the time of the hearing, Child had been in placement for more than three years. *Id.* at 241.

At the termination hearing, CYF presented the testimony of its case worker, Beverly Damron. Damron testified that Father's goals were to complete a drug and alcohol evaluation at POWER and follow all recommendations; participate in supervised visitation; work with in-home services for parenting; and complete an intimate partner violence ("IPV") assessment. N.T., 7/5/24, at 63. CYF had concerns about Father's drug and alcohol use and his history of five Driving Under the Influence ("DUI") convictions. *Id.* at 64-65. Damron testified that Father told her that "he needed to drink a beer in the morning to settle his stomach." *Id.* at 68. CYF subsequently set forth additional goals for Father, including attending random drug screens, addressing his outstanding criminal issues, and attending Child's

medical appointments. *Id.* at 82-83. Dual diagnosis treatment was also recommended. N.T., 1/10/25, at 44.

Damron testified that CYF made six referrals to POWER for Father, and Father attended at least one assessment. N.T., 7/5/24, at 70-71. After Father's evaluation in November 2023, POWER recommended that Father attend a 3.7-level inpatient detox treatment, which is medically monitored inpatient treatment, but Father declined. N.T., 2/19/25, at 116. Damron believed that, at the time of the hearing in July 2024, Father was engaged in outpatient drug and alcohol treatment at Jade Wellness ("Jade"). N.T., 7/5/24, at 72. She stated that Father started that treatment in December 2023 and was compliant with the program. *Id.*; N.T., 2/19/25, at 79-80, 115-16. Prior to his treatment at Jade, Father reported that he was engaged in a drug and alcohol program at the Department of Veterans Affairs ("VA"). N.T., 7/5/24, at 72-73.

Damron explained that Father and Mother initially had supervised visits with Child at the Bayer Foundation three days per week for two hours each. *Id.* at 84. Damron stated that Father "attended the majority of those visits." *Id.* Father and Mother were arrested in November 2022 after an incident of IPV, and Mother moved out of the marital home. *Id.* at 77-78, 81, 85. Following this incident, CYF determined that Mother and Father should have separate visits with Child. *Id.* at 87. Father's visits were moved to his house and were supervised by CYF. *Id.* at 86. At some point, CYF "attempted to transition [Father] to unsupervised" visits by having at least one hour of the

visitation be unsupervised. N.T., 2/19/25, 17-18. Damron stated that the offer of unsupervised visits "was rescinded based on the results of [Father's] last POWER assessment in which the agency had concerns about [Father] testing positive for alcohol at . . . 9 o'clock in the morning." *Id.* at 18.

Damron testified that during her time as caseworker from April 25, 2022 to August 26, 2024, Father was consistent with visits. *Id.* at 54-55. Damron said that the visits generally went well, but she had observed Father "lose his temper" and have some "verbal outburst[s] or aggression" at the visits. N.T., 7/5/24, 112-14. Damron testified that Father would not allow Child to bring any comfort items, such as a pacifier or blanket, from Foster Parents' home to the visits, which would cause Child to cry and ask for those items. *Id.* at 114-15. However, she said that Child was comfortable in Father's home, Child would follow Father around, and Father began making more appropriate meals for Child. NT., 2/19/25, at 98-99. Damron testified that Foster Parents are meeting all of Child's psychological and developmental needs and it is a pre-adoptive home. *Id.* at 18-19.

Damron indicated that Father was initially noncompliant with in-home services but reengaged with in-home services and was "more compliant with" his second round of in-home services. N.T., 7/5/24, 102-03; N.T., 2/19/25, at 115. Damron further stated that Father completed IPV treatment. N.T., 7/5/24, at 104-05; N.T., 2/19/25, at 56-57. Damron explained that CYF no longer had concerns about IPV because Father and Mother had separated. N.T., 7/5/24, at 105. Damron also testified that Father attended an intake

assessment at Mercy Behavioral Health ("Mercy") in May 2024 to address the mental health component of his dual diagnosis. *Id.* at 106-07. Damron indicated that she had not received any verification that Father completed his mental health and drug and alcohol treatment. N.T., 2/19/25, at 122.

Damron further testified that Child had 29 medical appointments, which included wellness checks, specialists, dentists, and special testing. *Id.* at 7. She testified that Father attended one of Child's 29 appointments on April 26, 2024. *Id.* at 7-9. Damron acknowledged that when she left the case in August 2024, Father was trying to achieve his goals. *Id.* at 95.

Tarraca Jackson of the Allegheny Health Department testified that Father was called in for drug screens 90 times. N.T., 7/5/24, at 9. Jackson stated that Father completed 26 screens, had 52 no-shows, and two refusals. *Id.* Of those 26 screens, Father tested positive for THC every time. *Id.* at 9-11, 24. Jackson acknowledged that Father had a medical marijuana card. *Id.* at 18. Father tested positive for alcohol on five screens. *Id.* at 10-11. On June 20, 2024, immediately prior to the last permanency hearing before the termination proceedings, Father tested positive for THC and alcohol. *Id.* at 98-99.

Rachel Wagner, the program director of the intake department at POWER substance abuse facility, testified as an expert in drug and alcohol counseling and treatment programs. The trial court summarized Wagner's testimony as follows:

[Wagner] stated that there were 4 evaluations: June 24, 2022, where Father was positive for alcohol and marijuana; March 27, 2023, where Father was positive for alcohol and marijuana; November 10, 2023, where Father was positive for alcohol and marijuana; and October 22, 2024, where Father was positive for marijuana.

The June 24, 202[2] referral and evaluation and report indicated that the alcohol tests usually are sensitive for 24 hours. The [recommendation] was for the 1.0[-level outpatient] treatment. The 30 and 60 day follow ups resulted in no confirmation of treatment and Father's case was closed.

The March 27, 2023 referral and evaluation and report was completed on March 27, 2023 and recommended treatment for Father. The 30, 60 and 90 day updates were called and Father reported that he was enrolled in the recommended treatment.

The November 10, 2023 referral and evaluation and report recommended that Father be enrolled in treatment at level 3.7 [medically monitored inpatient treatment]. Father tested positive for alcohol as he said that he had had a half of a glass of alcohol that morning prior to being tested for alcohol.

Father stated that he gets an upset stomach if he does not drink daily. Testimony was provided to the [c]ourt that those who drink daily do have upset stomachs if they do not drink daily as this is an issue due to withdrawal symptoms.

Father declined the 3.7 level treatment and began a 2.1 level treatment.[1] A referral was made on November 16, 2023. The 30 day follow up was completed and no treatment was recommended. The 60 day follow up was completed on 1/11/202[4] and no treatment was recommended. The 90 day follow up was completed and Father stated that he was in treatment.

The October 22, 2024 referral and evaluation and report recommended drug and alcohol treatment. The last CYF

_____

[1] The record does not indicate what type of treatment a 2.1 level treatment is.

- 6 -

referral was done due to Court Order. Father was diagnosed with anxiety disorder, and his level of care was for outpatient services of 1.0.

Trial Court Opinion, 5/9/24, at 9-10.

Ciera James, the CYF permanency case worker, testified that she took over the case from Damron in August 2024. N.T., 1/10/25, at 207. James testified that Father was consistent with visits with Child. *Id.* at 262. She said that the visits have been "status quo" and there had been ongoing concerns with Father's frustration at the visits, Child not eating a full meal at visits, and Child being in the wrong diaper size after the visits. *Id.* at 258-59. James noted that the visits continued to be supervised by CYF and Father has never had any overnight visits with Child. *Id.* at 303.

James further testified that Father had been engaged in mental health treatment at Mercy since May 2024, and in drug and alcohol treatment at Jade since December 2023. *Id.* at 280-81, 298-99, 301. James noted Father started both programs after the termination petition was filed in July 2023. *Id.* at 299, 301. James testified that CYF continues to have concerns regarding Father's sobriety. *Id.* at 299. She pointed out that although Father was attending treatment programs, he continued to have positive screens. *Id.* at 303, 307. James explained that "the same issues persist:"

> [W]e don't have demonstrated sobriety, we don't have enough evidence, enough screens, enough negative screens. Even though there's engagement in treatment, [Father is] still testing positive, even through Jade, and so we don't have the evidence that he is maintaining sobriety at this time.

*Id.* at 303. James emphasized that Father tested positive on the morning of a visit with Child. *Id.* at 240. James said that CYF also had concerns of Father's minimization of alcohol use and "the circumstances that led to this point." *Id.* at 241.

James testified that she had no concerns with Foster Parents' care of Child. *Id.* at 239. She stated that Foster Parents' home is a pre-adoptive home and Foster Parents meet all of Child's psychological and developmental needs. *Id.* at 239-40. James emphasized that Child needs permanency and opined that Child should be adopted by Foster Parents, "who are meeting his day-to-day needs" and "provide him [with] safety, security, [and] stability." *Id.* at 241-42.

Dr. Terry O'Hara, a licensed psychologist specializing in forensic psychology, gave expert testimony that he conducted four evaluations on Father, Child, and Foster Parents over a period of two years. *Id.* at 16-17, 138. Dr. O'Hara stated that at the first evaluation in February 2023, Father acknowledged that he had five DUI's in the past but stated that "millions of people have DUI's." *Id.* at 24-25. Father denied abusing alcohol but told Dr. O'Hara that his counselors have referred to him as a "functional alcoholic." *Id.* at 28. Father indicated that he drank four to six beers after work four to five days per week. *Id.* Father acknowledged that drinking had a negative impact on his thinking. *Id.* Dr. O'Hara stated that Father's "[i]nsight and judgment were assessed as poor" and Father "externaliz[ed] responsibility." *Id.* at 26-27, 34. Dr. O'Hara explained that externalization of responsibility means "not

owning up to one's own responsibility for things" and "[i]t's difficult to find motivation to want to change when you're blaming other people for your circumstances." *Id.* at 34, 35. He stated that Father blamed Mother for Child being in care and blamed Foster Parents for Child crying during visits. *Id.* at 27, 40, 55-56. Dr. O'Hara diagnosed Father with alcohol use disorder – severe and spousal or partner violence. *Id.* at 35.

Dr. O'Hara observed that Father exhibited positive parenting skills with Child, such as showing affection and praise to Child, during the interactional phase of the evaluation. *Id.* at 38-39. Dr. O'Hara likewise observed that Foster Parents showed positive parenting skills with Child during their interactional phase and Child looked to Foster Mother for support. *Id.* at 42-43. Dr. O'Hara observed that Foster Parents were affectionate, playful, and nurturing to Child. *Id.* at 42. He testified that Child "consistently directed himself to" Foster Parents and "smiled and laughed" throughout the evaluation. *Id.* After the first evaluation, Dr. O'Hara advised against reunification and recommended dual diagnosis treatment for Father. *Id.* at 44.

Dr. O'Hara's second evaluation of Father took place approximately eight months after the first, in October 2023. *Id.* at 46. As part of Father's second evaluation, Dr. O'Hara reviewed an assessment of Father by Dr. Leigh Gemmel, a clinician at the Center for Treatment of Addictive Disorders at the VA. *Id.* at 48-49. Dr. Gemmel diagnosed Father with severe alcohol use disorder and mild cannabis use disorder. *Id.* at 50. Father reported to Dr. Gemmel that alcohol had impacted his physical and emotional health, and that

he "drank more than intended" and had "cravings for alcohol." *Id.* Father informed Dr. Gemmel that he "only made this appointment because he [was] court[-]ordered to [do] treatment." *Id.* at 51. Father indicated that he had "no interest in making any changes to his behavior" and did not think his use of alcohol or marijuana was problematic. *Id.* Father reported to Dr. O'Hara that he decreased his alcohol usage. *Id.* at 65. Father told Dr. O'Hara that he continued to blame Mother for the situation he was in. *Id.* at 55-56.

Dr. O'Hara again observed that Father exhibited positive parenting skills during the interactional portion of the evaluation. *Id.* at 60. Dr. O'Hara stated that Child called Father "Daddy" and reached for Father to pick him up. *Id.* at 61. He said that "generally speaking," he believed that Father had a bond with Child and Father cared about Child. *Id.* at 62. Dr. O'Hara still had concerns about Father "not showing great insight with regard to his alcohol-use history" and his "extremely antagonistic" view of Foster Parents. *Id.* at 64. Dr. O'Hara believed that Father "shouldn't be using alcohol at all[.]" *Id.* Nonetheless, Dr. O'Hara believed Father "had made gains" and that "reunification was viable" after the second evaluation. *Id.* at 63, 65.

About three months after the second evaluation, Dr. O'Hara conducted a third evaluation of Father, in January 2024. *Id.* at 67. Dr. O'Hara had received a report from CYF which stated that Father "was using alcohol" and was "not quantifying how much he drinks." *Id.* at 68. The report further indicated that Father drank prior to a court hearing in the morning and tested positive for alcohol at 9:00 a.m. *Id.* Father also exhibited his "need to drink a

beer after a visitation." *Id.* The report further indicated that Father had "low frustration tolerance" and "lack of self-control," was "verbally aggressive," and would scream at the caseworkers in the presence of Child. *Id.* at 68-69, 71. Father's visits with Child were appropriate and he never appeared intoxicated at visits. *Id.* at 70-71. Father reported to Dr. O'Hara that he still had one or two beers after work, but that he "cut down tremendously." *Id.* at 73.

Dr. O'Hara opined that Father's main impediment to potential reunification with Child was his failure to demonstrate sobriety. *Id.* at 81. Dr. O'Hara was concerned about Child "being exposed to alcohol-use issues and affective instability or frustration tolerance" by Father and that "there could be [a] risk of [Child] being in an environment where [Father] is using alcohol to manage stress." *Id.* at 77, 78-79. Dr. O'Hara further noted that permanency for Child was of "urgent importance" as Child had been in care for two years at this point. *Id.* at 77.

Dr. O'Hara's final evaluation of Father took place in December 2024. *Id.* at 81. Prior to the evaluation, CYF provided Dr. O'Hara with updated information. *Id.* at 82-83. The report indicated that "there was some affective instability by [Father] in front of [Child], that his anger is sometimes directed toward [Child], and that [Child is] upset and uncomfortable when this happens." *Id.* at 83. Dr. O'Hara spoke to Rhianna Lee, the case worker from Every Child, who indicated that Father had not made much progress and there was no solid plan in place for daycare for Child if Child was to live with Father. *Id.* Lee observed several "intense moments of anger where [Father] was loud

or cursing," which "rattled" Child. *Id.* Lee had not observed Father ever drink in Child's presence, but Father was "vague" with her about his alcohol usage, and she saw beers in his fridge. *Id.* at 83-84.

Dr. O'Hara also spoke to Shontay Carter, the case worker at Holy Family Institute, who indicated to Dr. O'Hara that visits between Father and Child were going well. *Id.* at 84. Carter did not believe that Father's yelling negatively affected Child because Child was "used to his father, almost . . . habituated to his father yelling at people[.]" *Id.* at 84-85. Carter told Dr. O'Hara that Father was "passionate," and the yelling was not directed toward Child. *Id.* at 84.

Father informed Dr. O'Hara at this evaluation that his current alcohol usage was "as needed" but had "declined drastically." *Id.* at 88. Dr. O'Hara testified that Father was evasive and "very vague about [his] alcohol usage." *Id.* at 87, 120, 136. Dr. O'Hara asked Father multiple questions about his alcohol usage because he believed "it is a foundational part of this case," but he "was not able to get much information about [Father's] alcohol usage." *Id.* at 87-88. Dr. O'Hara testified that Father had "not been forthcoming about how much he's using, and he's not acknowledged that drinking has really had a lot of negative effects for him historically." *Id.* at 120. Dr. O'Hara opined that Father would have to demonstrate sobriety "over a consistent period of time" before reunification could be considered. *Id.* at 136. Dr. O'Hara further testified that Father continued to exhibit signs of externalization and refused to take any responsibility for his situation. *Id.* at 86, 88-89, 97, 111-12.

During his last interactional evaluation of Father and Child, Dr. O'Hara observed that Child was "pretty distressed for the entirety of the evaluation." *Id.* at 91. Dr. O'Hara said that Child cried for most of the visit and Child "wasn't utilizing his father for comfort at all[.]" *Id.* at 91. Dr. O'Hara testified that when Child said, "I want to go to mom," in reference to Foster Mother, Father replied, "She's not your mom." *Id.* at 91, 93. In Dr. O'Hara's view, "[t]here were times where [Father] was clearly not offering to comfort [Child] when [Child] was distressed and upset," which showed Father's "lack of understanding of [Child's] psychological position." *Id.* at 93. Dr. O'Hara was concerned about Father's "lack of emotional support" for Child if reunification were to occur. *Id.* at 95.

Dr. O'Hara opined that there could be a "significant negative effect for [Child] psychologically" if Child was removed from Foster Parents. *Id.* at 97. He noted that Child has been placed with Foster Parents since birth and is attached to them. *Id.* He said that Foster Parents have "shown positive parenting skills consistently over several interactionals" and Child "has exhibited several factors of security" with Foster Parents. *Id.* Dr. O'Hara opined that while Child has a bond and a good relationship with Father, Father has not made progress in "understanding [Child's] psychological position" throughout the case and Child needs permanency. *Id.* at 96, 98, 138. Dr. O'Hara testified that he "lack[ed] evidence that [Father] would be able to provide a real supportive understanding environment for [Child], which would be in [Child's] best psychological interests." *Id.* at 98.

Lynn Dutton, Foster Mother, testified that Child has lived with Foster Parents since he was six days old. N.T., 2/20/25, at 155. She said that Child calls Foster Mother and Foster Father "Mom" and "Dad," respectively. *Id.* at 191. Foster Mother testified that Child calls Father "Dwayne." *Id.* She stated that she sometimes refers to Father as "Daddy Dwayne" to Child for clarification purposes because if she said the name "Dad," Child is "automatically going to assume that [she] is speaking about [Foster Father], which is the person that lives in the home with us as the father figure." *Id.* at 199-200. Foster Mother said that if Child was to be adopted, she would be open to Child having contact with Father because she "believe[s] 100 percent that it's in the best interest of the child . . . to maintain a relationship with their biological parents." *Id.* at 162-63.

Rachel Dingfelder, an outpatient therapist at Mercy, testified that Father had been attending individual therapy since May 2024. N.T., 2/19/25, at 132, 133. Dingfelder stated that Father initially had therapy sessions twice a month but in October or November 2024, she and Father mutually agreed that the sessions be held once a month for 50 minutes. *Id.* at 133, 143, 151. Dingfelder testified that Father was engaged and compliant in the therapy sessions. *Id.* at 133. Dingfelder stated that Father's two goals were to use patience and cope better with frustration. *Id.* at 133. Father reported to Dingfelder that he had been using the coping skills he learned in therapy to achieve these goals, including breathing and responding instead of reacting. *Id.* at 134-35. Dingfelder testified that Father attended 12 therapy sessions

and missed six. *Id.* at 144. Dingfelder acknowledged that some of Father's missed therapy visits may have been because he "had a mandatory or an important appointment in regard to his healthcare or his case." *Id.* at 149.

Shontay Carter, a visitation coach from Holy Family Institute, testified that she supervised Father's visits with Child since July 2022 and provides parenting support and recommendations during the visits. *Id.* at 153-54. Carter stated that visits were initially at the Bayer Foundation from July 2022 to September 2022 and then visits were moved to Father's house. *Id.* at 157, 162. Father had visits twice a week for a total of five hours. *Id.* at 201. Carter testified that Father was consistent with attending visits, there were no safety concerns at Father's house, and the house was "kid-friendly." *Id.* at 160, 162-63, 166, 190. She stated that Father provided Child with activities and educational toys and books during visits, and would cook for Child. *Id.* at 164, 167-68. Carter said that Father purchased books for himself about the "developmental stages so he knew where his son should be at a certain age." *Id.* at 161. She stated that Father made sure Child was reaching the appropriate milestones. *Id.* at 173-74. Carter testified that Father "parented naturally" and knew how to soothe Child. *Id.* at 161, 195. She noted that as the case went on, Father became more patient dealing with Child's feeding issues and more open-minded to feedback and constructive criticism. *Id.* at 193-94, 195, 199. Carter opined that Child feels safe and very comfortable with Father. *Id.* at 175. She pointed out that Child looks forward to visits with Father, grabs for Father if he is upset, and follows Father around during visits.

*Id.* at 175, 185. Carter testified that Child calls Father, "Dad." *Id.* at 176. Carter said that Father "has a plan for the future" and has "already had a daycare in mind for quite some time and he already filled out the paperwork[.]" *Id.* at 177, 196.

Carter stated that she has observed Father use coping techniques when he was frustrated, such as pacing or walking away, and he does not take his frustration out on Child. *Id.* at 184-85. Carter acknowledged, however, that at one visit in December 2024, Father yelled at Child for crying about his coat. *Id.* at 205-06. Carter had to cut another visit short in December 2024 because she noticed an open beer can on the counter in the kitchen. *Id.* at 204-05, 211-12. Carter testified that Father did not appear intoxicated and she did not see Father consume any alcohol. *Id.* at 212. She added that she never smelled alcohol on Father at the visits. *Id.* Carter opined that Father "probably should have unsupervised time right now." *Id.* at 191.

Donna Allen, the Director of In-Home Services and Visit Coaching at Holy Family Institute, testified that she is Carter's supervisor and filled in for Carter on one of Father's visits in December 2024. N.T., 2/20/25, 5, 8, 12. Allen stated that the visit went "very well." *Id.* at 9. She said that Father affectionately greeted Child, asked appropriate and engaging questions to Child, played games and read to Child, and made food for Child. *Id.* at 9-10. In Allen's view, "[e]very part about the visit was appropriate" and there was "good interaction" between Father and Child. *Id.* at 10. Allen further testified that Child knew that Father was his father and had a positive attachment and

bond with Father. *Id.* at 11. After supervising this visit, Allen believed that Father "was interested in being present there for [Child] and being a good father, and that he is ready and willing to parent [Child] himself." *Id.* at 13-14.

Father testified on his own behalf. He stated that after Child was born, he wanted Child to be in his care. *Id.* at 17, 58-59. Father testified that by the time he got to the hospital, CYF had already decided that Child would be placed in its care due to concerns with Mother's mental health. *Id.* at 59. He acknowledged that he was living with Mother at the time. *Id.* at 117. Father testified that Mother was the reason that Child was removed from their care. *Id.* at 118.

Father testified that he loves Child and wants the opportunity to raise him. *Id.* at 22, 57, 114. Father said that Child was his "best friend" and a "true blessing" and that Child knew that Father was his father and was bonded to him. *Id.* at 65-66. Father indicated that he could handle the responsibility of taking care of Child. *Id.* at 114. Father testified that he was consistent with visitation and only missed two visits with Child over the course of three and one-half years. *Id.* at 22. Father believed that he should be permitted to have unsupervised visits with Child, but he would want CYF to "[c]ome check on [him] every now and then" to make sure that he and Child were "where [CYF] want[s] us to be." *Id.* at 21. Father acknowledged that he never had an overnight visit with Child. *Id.* at 99. Father stated that his home is safe and his "home has been assessed by counselors and people." *Id.* at 101. He

indicated that he is able to support Child financially and has family support. *Id.* at 71.

Father testified that he underwent five POWER assessments. *Id.* at 37. Father said he could not afford to do an inpatient program but attended an outpatient program at Jade. *Id.* at 33-34, 37-38. Father believed that he benefited from the program at Jade and was "open-minded now." *Id.* at 33, 35. Father said that he completed "90 percent" of his drug and alcohol goal. *Id.* at 81. Father indicated that he would voluntarily continue to attend outpatient for one hour per month after the case is closed. *Id.* at 60-61, 80. Father testified that he receives mental health treatment at Mercy as part of his dual diagnosis and his treatment there is "in progress," which means "it's still going on." *Id.* at 29, 120-21. He stated that he had improved on dealing with his frustration and patience due to coping skills he gained at Mercy. *Id.* at 53-55.

Father testified that he was aware of Child's medical appointments, but he could not attend them due to a lack of transportation. *Id.* at 42-43. He explained that he does not have car and there were no buses that went to Bridgeville, which was where most of Child's appointments took place. *Id.* at 43-44. Father stated that he has worked at the same job for three years. *Id.* at 51. Father testified that he planned to do a "partial retirement" to spend time with Child. *Id.* at 52. Father's plan was to work Monday through Wednesday and be home with Child Thursday through Sunday every week. *Id.* Father explained that he would put Child in daycare on the days that he

worked. *Id.* at 52, 70. Father testified that he had already enrolled Child in a daycare near his work. *Id.* at 90-91. He stated that if he obtained custody of Child, he would consider Child having some contact with Foster Parents because "[t]he attachment is there[.]" *Id.* at 62-64.

Father denied that he has an alcohol problem. *Id.* at 129. He acknowledged that he told Dr. O'Hara that he has been told he was a "functioning alcoholic" and that he, at some points, struggled with alcohol, but testified that his alcohol use "is declining drastically." *Id.* at 127, 128-29. Father refused to quantify the amount of alcohol he drinks. *Id.* at 123. Father indicated that he does not intend to drink alcohol in the presence of Child. *Id.* at 79. Father testified that he has "at least attempted" every goal that CYF gave him and has "been doing everything according to the court orders for the last three-and-a half years[.]" *Id.* at 89, 105.

Linda Willis, Father's sister ("Aunt"), testified that she lives in North Carolina and has video visits with Child when Child is visiting Father. *Id.* at 141-42. Aunt stated that Father "has the support of his family behind him emotionally, morally, physically, [and] financially." *Id.* at 147. Aunt testified that she did not request to be a placement option for Child because Father's "whole goal . . . was that he wanted to get his son to raise his son himself." *Id.* at 151.

After the termination hearing, the trial court granted CYF's petition for involuntary termination of Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (a)(5), and (a)(8), and § 2511(b). This appeal followed.

Father raises the following issues:

I.   Did the trial court err in finding that CYF met its burden under 23 Pa.C.S.[A.] § 2511(a)(2), (a)(5), and (a)(8) by clear and convincing evidence?

II.  Did the trial court abuse its discretion in concluding that termination of Father's parental rights would best serve the Child's needs and welfare under § 2511(b) despite evidence of a meaningful bond?

III. Did the trial court improperly disregard Father's substantial progress and compliance with court-ordered goals initiated prior to and after the TPR petition was filed?

Father's Br. at 6 (suggested responses omitted).

We review an order involuntarily terminating parental rights for an abuse of discretion. *In re G.M.S.*, 193 A.3d 395, 399 (Pa.Super. 2018). We "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012)). "If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion." *In re Adoption of K.C.*, 199 A.3d 470, 473 (Pa.Super. 2018). We will reverse a termination order "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *In re Adoption of S.P*., 47 A.3d at 826.

A party seeking to terminate parental rights has the burden of establishing grounds for termination by clear and convincing evidence. *In re Adoption of K.C.*, 199 A.3d at 473. "Clear and convincing evidence is evidence 'that is so clear, direct, weighty, and convincing as to enable the trier

of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue.'" *Id.* (citation omitted).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). Under this provision, the trial court must conduct a bifurcated analysis prior to terminating parental rights:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (citations omitted). To affirm the termination of parental rights, this Court need only affirm the trial court's decision as to any one subsection of Section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

Here, the court terminated Father's parental rights pursuant to Section 2511(a)(2), (5), and (8), as well as under Section 2511(b). As only one basis for termination under Section 2511(a) is necessary, we will focus our attention on Section 2511(a)(8), which states:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

***

> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

Section 2511(a)(8) "sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." **In re A.R.**, 837 A.2d 560, 564 (Pa.Super. 2003). Once the 12-month period has been proven, the court "must next determine whether the conditions that led to the children's removal continue to exist." **Id.** "Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services." **In re Z.P.**, 994 A.2d 1108, 1118 (Pa.Super. 2010). Rather, the relevant inquiry "is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." **In re I.J.**, 972 A.2d 5, 11 (Pa.Super. 2009). Further, with respect to a petition filed under Section 2511(a)(8), a "court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." **See** 23 Pa.C.S.A. § 2511(b).

This Court has recognized that "the application of Section 2511(a)(8) may seem harsh when the parent has begun to make progress toward

resolving the problems that had led to the removal of [his or] her children."

***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa.Super. 2006).

> However, by allowing for termination when the conditions that led to removal of the child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time . . . in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

***Id.*** (emphasis removed).

Here, it is undisputed that at the time of the filing of the termination petition, Child had been out of Father's care for over 12 months. Therefore, we next focus our inquiry on whether the conditions that led to Child's removal from Father's care continued to exist.

The court found that the conditions that existed at the time of Child's placement continued to exist. ***See*** Trial Ct. Op. at 30. The court noted that Father failed to complete his goals of screens, drug and alcohol treatment, and mental health treatment. ***Id.*** It further pointed out that Father's visits remained supervised. ***Id.***

We discern no abuse of discretion. The record supports the court's finding that the conditions that led to Child's removal continued to exist. To his credit, Father was consistent with visiting Child throughout the case and completed IPV treatment. However, he did not begin drug and alcohol

treatment at Jade and mental health treatment at Mercy until after the filing of the petition. There was also testimony by numerous witnesses that there continued to be concerns about Father's sobriety and Father tested positive for alcohol multiple times throughout the case. Dr. O'Hara opined that Father's main impediment to reunification with Child was his failure to demonstrate sobriety. Dr. O'Hara testified that he still had concerns about Father's sobriety after conducting his final psychological evaluation in December 2024. James testified that CYF continued to have concerns regarding Father's sobriety because, although Father was attending treatment programs, he continued to have positive screens. Father himself acknowledged that he continues to drink alcohol and refused to quantify the amount of alcohol he drinks. There was also testimony that Father continued to exhibit signs of externalization and refusal to take responsibility for his situation. Because the conditions that led to Child's removal continued to exist, and as discussed below, termination of parental rights would best serve the needs and welfare of Child, we find the trial court properly concluded that the requirements of Section 2511(a)(8) were satisfied.

We next consider the court's finding that termination was warranted pursuant to Section 2511(b). Under Section 2511(b), the trial court must consider "the developmental, physical and emotional needs and welfare of the child" to determine if termination of parental rights is in the best interest of the child. *See* 23 Pa.C.S.A. § 2511(b). The court must also examine the parent-child bond, "with utmost attention to the effect on the child of

permanently severing that bond." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005). However, the "mere existence of an emotional bond does not preclude the termination of parental rights." *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011).

In addition to examining the parental bond, the court must consider other important factors, including "the child's need for permanency and length of time in foster care," "whether the child is in a pre[-]adoptive home and bonded with foster parents," and "whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." *Int. of K.T.*, 296 A.3d 1085, 1113 (Pa. 2023).

Here, the court recognized that Child had a bond with Father "such that severing that bond would have an adverse impact upon the Child[.]" Trial Ct. Op. at 32. The court nevertheless found that severing that bond and terminating Father's parental rights would be in the best interests of Child. *Id.* The court considered the evidence that, *inter alia*, Child was strongly bonded to Foster Family, is happy, safe, and secure in the foster home, which is a pre-adoptive home, and had been in care for over three years in determining that termination of Father's parental rights was in Child's best interest.

The record supports the court's factual findings and it committed no error of law or abuse of discretion. The evidence clearly shows that Child is secure, loved, and thriving in Foster Parents' pre-adoptive home, where he

has lived his entire life and Foster Parents meet all of Child's needs. Dr. O'Hara opined that there could be a "significant negative effect for [Child] psychologically" if Child was removed from Foster Parents. N.T., 1/10/25, at 97. While there was testimony that Child has a bond and good relationship with Father and that Father exhibited positive parenting skills, Father has never had Child in his care and has failed to demonstrate that he can meet Child's needs. In Dr. O'Hara's opinion, which the court was permitted to credit, Father has not made progress in "understanding [Child's] psychological position" and there was no evidence that Father "would be able to provide a real supportive understanding environment for [Child], which would be in [Child's] best psychological interests." *Id.* at 98, 138. Accordingly, we agree with the court's finding that CYF proved by clear and convincing evidence that termination of Father's parental rights was in Child's best interest.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 11/10/2025

- 26 -